# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Charles P. Kocoras | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 600 | **DATE** | 4/19/2001 |
| **CASE TITLE** | Pentz vs. TurServ Corp | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Ruling held. **ENTER MEMORANDUM OPINION:** We deny Plaintiff Paul E. Pentz's motion (Doc 28-1) for summary judgment. Pretrial order to be filed on or before June 29, 2001.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | Document Number |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | APR 2 0 2001 date docketed | 38 |
| | Notified counsel by telephone. | | |
| ✓ | Docketing to mail notices. | LS docketing deputy initials | |
| | Mail AO 450 form. | | |
| | Copy to judge/magistrate judge. | date mailed notice | |
| SCT | courtroom deputy's initials | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PAUL E. PENTZ, )
)
        Plaintiff, )
)
vs. ) 00 C 600
)
TRUSERV CORPORATION, )
)
        Defendant. )

DOCKETED
APR 2 0 2001

## MEMORANDUM OPINION

CHARLES P. KOCORAS, District Judge:

Before the Court is Plaintiff's Motion for Summary Judgment. For the following reasons, we deny the motion.

### BACKGROUND[1]

Plaintiff Paul E. Pentz ("Pentz") is the retired President and co-Chief Executive Officer of Defendant TruServ Corporation ("TruServ"). (Pentz Aff. ¶ 2.) TruServ was formed by the 1997 merger of Pentz's former company, ServiStar Corporation, and Cotter & Company. (Id. ¶¶ 3, 5.) Following the merger, Pentz became President and

---

[1] Our rendering of the facts in this case was complicated by Pentz's failure to respond to TruServ's Statement of Additional Facts in accordance with Local Rule 56.1.

38

Chief Operating Officer of TruServ. (Id. ¶ 6.) Daniel Cotter ("Cotter"), the former President and Chief Executive Officer of Cotter & Company, served as Chief Executive Officer and Chairman of the Board of Directors of TruServ. (Id.) In January 1998, Pentz's title changed to President and co-Chief Executive Officer, and Cotter became Chairman of the Board and co-Chief Executive Officer. (Id.)

As President and Chief Operating Officer of TruServ, Pentz assumed responsibility for designing, implementing and managing an executive compensation system. (Id. ¶ 6.) The system had three components: (1) base pay, or salary; (2) an annual bonus; and (3) a long term incentive award or bonus. (Id. ¶ 8.) The Board meted out both types of bonuses according to pre-established performance goals. (Id.) Those goals were comprised of: (1) individual goals set by the Board for Pentz and Cotter; (2) individual goals set by Pentz and Cotter for subordinate executives; and (3) corporate goals set by the Board for the corporation on three-year rolling cycles. (Id.) The Board then graded performance against the goals. (Id.) Annual bonuses were awarded based on achievement of the individual awards, whereas long term incentive bonuses were based on the corporation's achievement of corporate goals. (Id. ¶ 9.)

The Board approved this executive compensation system during its meeting on August 14, 1997. (Id. ¶ 10.) The adoption of this plan required the abolition of the

ServiStar and Cotter & Company plans. (Id. ¶ 11.) In fairness to officers, TruServ paid out the long term incentive awards which executives had partially earned to that point. (Id.) Because the Board had no way to measure whether ServiStar and Cotter & Company would have achieved their corporate long term goals beyond 1997 had the merger not occurred, TruServ assumed 100% performance by both companies in making the calculation. (Id.) Since two-thirds of the three-year long term goals ending 1998 had been presumptively achieved by the time of the 1997 merger, the Board approved a pay out of two-thirds of the long term incentive award expected for 1998. (Id.) Similarly, since one-third of the three year goals for 1999 had been achieved by the date of the merger, the Board approved the payment of one-third of the anticipated 1999 long term incentive awards. (Id.) Under this plan, Pentz received payments totaling $531,202. (Def. Statement of Additional Facts Requiring Summary Judgment ¶ 25) (hereinafter "Def. Facts"). Payment of these amounts terminated the long term incentive award plans of ServiStar and Cotter & Company. (Id.)

The merger also affected each company's Supplemental Executive Retirement Plan ("SERP"). After the merger, TruServ adopted its own SERP. (Pentz Aff. ¶ 15.) The SERP provided a defined lump sum benefit to executives upon retirement. (Id.) In order to calculate the lump sum benefit for executives such as Pentz, the SERP begins with the average of the participant's highest three years of salary in the previous

ten years. (Def. Facts ¶ 30.) That initial number includes base pay plus bonuses paid for performance. (Id. ¶ 31.) That number is multiplied by 660%. (Id.) The resulting number is then reduced by the actuarial equivalent lump sum amounts that the participant had received or was eligible to receive from other sources of benefits as described in the plan. (Pentz Aff. ¶ 15.) This admittedly abbreviated explanation of the SERP calculation reveals an important rule: the higher the input, the higher the output.

In June 1997 Pentz announced his intent to retire effective February 16, 1999, to coincide with his 59th birthday. (Pentz Aff. ¶ 18.) He subsequently moved the retirement date to December 31, 1998. (Id.) On July 21, 1998, Pentz delivered to his successor, Donald J. Hoye ("Hoye"), an administrative summary of TruServ's compensation plan to assist Hoye in administering the plan. (Id. ¶¶ 18-19.) The summary expresses a company "custom" of including an executive's final bonus in the prior year's income for purposes of calculating the SERP benefit. (Id.) According to the report,

> For the calculation of retirement earnings the total of the base pay and annual bonus are used. It is important to note that the year in which the bonus is paid is when it counts toward retirement, not the year in which it was earned. For that reason, it has been customary for the company to include the final bonus paid in the prior year's income calculation. In

other words, if a 1999 bonus of $200,000 is earned by an individual, it is normally paid in February 2000. If that individual retired at the end of 1999, the bonus paid in February 2000 would be added to the 1999 earnings. This slightly inflates the average three-year earnings and does result in a slightly increased retirement package. The precedent for this was established many years ago.

(Pl. Exh. 10, Administrative Summary, at 8.) TruServ counters that under the express language of the SERP, only amounts actually paid during the plan's calendar year are included. (Def. Facts ¶ 38.)

On or around October 22, 1998, actuarial consultant Mary Mitchell ("Mitchell") telephoned Pentz to discuss his SERP calculation. (Def. Facts ¶ 34.) Pentz expressed his belief that he would receive a 1998 annual bonus of $172,890 and a 1998 long term bonus of $339,000. (Id. ¶ 35.) Pentz maintained that these bonus amounts ought to be included in his 1998 salary computation, even though those amounts would be paid out in March 1999. (Id. ¶ 36.)

Mitchell disagreed. She understood the SERP to treat as income only those bonuses actually paid during the year in question. (Mitchell Dep. at 83; Pl. Exh. 28, Mitchell Mem. to Ostrov, at 2 n.1.) Director Peter Grant Kelly concurs, stating that "[n]o compensation is ever approved by the board prior to the end of the year and the

fiscal results of the year. [. . .] It's always approved by the board after the end of the year into the next year based on the statistics of that prior year." (Kelly Dep. at 27-28.)

After reviewing TruServ's SERP, Mitchell prepared an estimate of Pentz's benefits under the SERP. (Def. Facts ¶ 37.) The estimate excluded Pentz's anticipated bonuses. (Id. ¶ 38.) Shortly thereafter, Pentz asked his immediate subordinate Robert Ostrov ("Ostrov") to process a pre-payment of the 1998 anticipated bonuses. (Id. ¶ 40.) The amount of Pentz's projection was $511,277. (Id.) Ostrov told Pentz that he lacked the authority to process such payments. (Id. ¶ 41.)

TruServ's Board held a meeting on December 2-3, 1998. The Minutes of that meeting do not reflect any discussion of Pentz's retirement package. (Pl. Exh. 18, Minutes of Dec. 2-3, 1998 Board Meeting.) In his papers, Pentz intimates that the Board approved his annual incentives at this meeting, but this conclusion springs from a tortured analysis of the minutes of the meeting (which Pentz admits are "cryptic"). During the meeting, Pentz apparently proposed a change in the structure of annual incentives generally and the Board approved the change. (Id. at TS00058.) The minutes do not indicate, however, that the Board approved Pentz's annual bonuses at the December 1998 meeting.

The day following the Board meeting, Pentz drafted a document (the "Retirement Statement") outlining "what I understand to be the agreed upon

arrangements for my scheduled retirement of December 31, 1998." (Pl. Exh. 18, Retirement Statement, at 1.) In the Retirement Statement, Pentz instructed that his final check for 1998 would include pre-payments of his 1998 incentive awards of $285,777 for short-term incentive and $278,500 for long term incentive. (Id.) To justify the prepayment, Pentz explained that "[a]dvancing these awards is consistent with precedent established for other retired corporate officers. It also strengthens the motivation for goal achievement in the final year of employment for all officers." (Id.) Pentz asked Cotter to review the provisions of the Retirement Letter and "make certain that he agreed with them." (Pentz Dep. at 178.) Cotter wrote "OK" on the last page of the document and signed and dated it. (Retirement Statement at 2.) Cotter claims not to have realized that the Retirement Statement provided for pre-payment of the 1998 bonuses. (Def. Facts ¶ 42.)

Pentz's paycheck of December 31, 1998, included the prepayment of 1998 bonuses. (Pentz Aff. ¶ 30.) By February 1999, however, it became apparent that TruServ had performed well below expectations. (Def. Facts ¶ 48.) In light of the poor performance, senior management opted not to request that the Board consider awarding bonuses. (Id. ¶ 49.) On or about February 2, 1999, Cotter and Hoye telephoned Pentz to inform him of the senior management decision. (Id. ¶ 50.) During that telephone call, they instructed Pentz to return the bonuses. (Id.) In an email message later that

day, Pentz told Hoye that "[i]t is important to me that my Retirement Agreement not be recalculated if at all possible. If it would not be your intention to include the amount of the bvonus [sic] in my retirement calculation, then it would be very important to me to know what the new Retirement Agreement would be before the Board approves anything." (Def. Exh. 88, Email Message from Pentz to Hoye.)

The Board held its next meeting on February 25, 1998. (Pl. Statement of Undisputed Material Facts ¶ 13) (hereinafter "Pl. Facts"). At that meeting, the Board passed a resolution ratifying all business acts and decisions of TruServ officers during 1998 and 1999 to the date of the resolution. (Id. ¶ 14.) The minutes of the meeting indicate that Pentz's retirement was not discussed until after the resolution was passed, and Hoye confirms this. (Pl. Exh. 25, Minutes of Feb. 25, 1998 Board Meeting, at 11; Hoye Dep. at 176.) The minutes do not manifest the extent of the discussion of Pentz's retirement. (Pl. Exh. 25, Minutes of Feb. 25, 1998 Board Meeting, at 11.) Hoye recalls that many Board members first learned of the pre-payment of Pentz's bonuses at this February meeting. (Hoye Dep. at 167.) According to Hoye, many members expressed surprise at the news. (Id.)

At the March 29, 1999 board meeting, the Directors accepted a report from the audit committee concluding that $511,777 in bonuses paid to Pentz in 1998 had not been earned. (Pl. Facts ¶ 15.) The Board approved a deduction in this amount from

the lump sum retirement benefit due to Pentz under the company's SERP. (Id.)
Ultimately the Board approved a net payment to Pentz of $1,222,053 plus $15,810 in interest for a grand total of $1,243,863. (Def. Facts ¶ 56.)

## LEGAL STANDARD

Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In seeking a grant of summary judgment the moving party must identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). This initial burden may be satisfied by presenting specific evidence on a particular issue or by pointing out "an absence of evidence to support the non-moving party's case." Celotex, 477 U.S. at 325, 106 S.Ct. at 2554. Once the movant has met this burden, the non-moving party cannot simply rest on the allegations in the pleadings, but "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). A "genuine issue" in the context of a motion for summary judgment is not simply a "metaphysical doubt as to the material facts," Matsushita

Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); rather, "[a] genuine issue exists when the evidence is such that a reasonable jury could find for the non-movant," Buscaglia v. United States, 25 F.3d 530, 534 (7th Cir.1994). When reviewing the record we must draw all reasonable inferences in favor of the non-movant; however, "we are not required to draw every conceivable inference from the record--only those inferences that are reasonable." Bank Leumi Le-Israel, B.M. v. Lee, 928 F.2d 232, 236 (7th Cir.1991).

## DISCUSSION

### 1. Cotter's Authority to Bind the Corporation

Pentz asks this Court to recognize the Retirement Statement as a binding agreement. In order to succeed, Pentz must convince this Court that Cotter acted as an authorized agent of TruServ in signing the Retirement Statement. As co-Chairman and CEO of TruServ, Cotter was clearly an agent of the company at the time he signed the Retirement Statement. The more difficult question is whether Cotter acted within his scope of authority when he signed the Retirement Statement and thus bound TruServ.

The authority of an agent falls generally into two categories: actual and apparent. Actual authority in turn has two components. See In re Mulco Prods., Inc., 123 A.2d 95, 103 (Del. Super. Ct. 1956.) It may consist of express authority granted to the agent by statute, corporate charter, by-law, or corporate action by the stockholders or Board

of Directors. See id. Alternatively, it may amount to implied authority, meaning that certain powers spring by necessary inference from those expressly granted. See id. We discern actual authority by scrutinizing the relationship between the agent and the corporation. See id.

The second category of authority, apparent authority, is cognizable when a principal creates the reasonable impression in a third party that his agent is authorized to perform a certain act on his behalf.[2] See Stathis v. Geldermann, Inc., 692 N.E.2d 798, 807 (Ill. App. 1998). To prove the existence of apparent authority, a party must establish that: (1) the principal consented to or knowingly acquiesced in the agent's exercise of authority; (2) the third party, based upon his knowledge of the facts, possessed a good faith belief that the agent possessed such authority; and (3) the third party relied to his detriment on the agent's apparent authority. See id.

In the instant case, TruServ has set forth facts sufficient to present a genuine issue as to Cotter's authority. TruServ's literature places compensation decisions firmly within the province of the Board, not individual directors and officers. The company's written by-laws reserve authority over executive salaries to the Board.

---

[2] We rely on Delaware law to define actual authority because the law of the state of incorporation guides the analysis. See Lee v. Jenkins Bros., 268 F.2d 357, 363 (2d Cir. 1959). Our apparent authority analysis, by contrast, looks to Illinois law as the place where the Plaintiff relied on the apparent authority. See id.

(Def. Exh. 20, By-Laws of TruServ, at 4). Moreover, the Board Handbook identifies the Board as responsible for executive compensation decisions. (Def. Exh. 42, TruServ Board of Directors Handbook, at 1.) Thus the literature indicates that the actual authority to make retirement decisions rested with the Board, not with individual officers or directors as Pentz asserts.

Even more significant are those facts suggesting that Pentz knew Cotter lacked authority to execute a retirement agreement that bound TruServ. If this is the case, then Pentz could not have had a good-faith belief in Cotter's authority and the Retirement Letter would not bind TruServ. In support of this contention, TruServ points to a memorandum authored by Pentz regarding the company's executive compensation scheme. Pentz explained, "[i]n the past, the board wanted to be informed of and approve all compensation levels for executives. With the size of the corporation today it seems reasonable that they be involved in the executive vice president level and above and count on the judgment of the president to manage the rest." (Def. Exh. 9, Memorandum of July 21, 1998 from Pentz to Hoye, at 3.) In a later email message, Pentz again displayed his understanding that the Board must approve retirement benefit decisions, writing, "If it would not be your intention to include the amount of the bvonus [sic] in my retirement calculation then it would be very important to me to know what the new retirement agreement would be before the board approves

anything." (Def. Exh. 88, Email of Feb. 2, 1999 from Pentz to Hoye.) Then at his deposition, Pentz confirmed this awareness by answering affirmatively that "there was no question in [his] mind that the board had ultimate authority over [his] compensation and bonuses." (Pentz Dep. at 104.)

In light of Pentz's repeated acknowledgments of Cotter's lack of authority, his present assertion of Cotter's authority is far from undisputed. Accordingly, the issue is not ripe for summary judgment.

2. Ratification

Pentz argues in the alternative that the Board ratified Cotter's act of signing the Retirement Statement. The concept of ratification derives from the law of agency. See Lewis v. Vogelstein, 699 A.2d 327, 334 (Del. Ch. 1997). It "contemplates the ex post conferring upon or confirming of the legal authority of an agent in circumstances where the agent had no authority or arguably had no authority." Id. Thus, where a corporate officer performs an act "without being authorized to do so, but which could have been authorized in the first instance by the Board of Directors [such transaction] may nevertheless become binding on the company if ratified expressly or by implication." Hannigan v. Italo Petroleum Corp. of Am., 47 A.2d 169, 171 (Del. 1945) (quoting 2 Fletcher Cyc. Corp. § 752 (Perm. Ed. 1992)). Ratification provides after the

fact the grant of authority that may have been lacking at the time of the agent's act. See Lewis, 699 A.2d at 334.

In the instant case, the Board passed in February 1999 a resolution ratifying all business acts and decisions of TruServ officers from 1998 until the date of the resolution. (Pl. Facts ¶ 14.) Because effective ratification requires knowledge of the ratifying body, the critical question is whether the Board knew that Cotter had signed the Retirement Letter at the time it passed the ratification resolution. See Frank v. Wilson Co., Inc., 32 A.2d 277, 283 (Del. 1943). Pentz points to four facts suggesting the Board's awareness of the prepaid bonuses. First, in his deposition Hoye recalls apprising the Board of Pentz's bonuses on February 25, 1999. (Hoye Dep. at 167.) Second, at least two directors had knowledge of the execution and terms of the Retirement Statement prior to the ratification resolution: Cotter, who signed the agreement, and Hoye, who received a copy within a few days. (Hoye Dep. at 103-104.) Third, both Cotter and Hoye witnessed Cotter promise to Pentz that the December 1998 bonuses would be included in the SERP calculations. (Hoye Dep. at 124-25.) Last, the Chairman and two Vice Chairmen of the Board, along with Hoye, had previously received Pentz's administrative summary of the executive compensation plan describing the policy of including an executive's final bonus in his prior year's income. (Pentz Aff. ¶ 19, Exh. 10.)

In response, TruServ has set forth specific facts creating a genuine issue for trial. First, TruServ submits that the directors who attended the February 1999 board meeting learned of Pentz's bonuses <u>after</u> they passed the ratification resolution. (Def. Exh. 19, Minutes of Feb. 25, 1999 Board Meeting, at 11; Hoye Dep. at 176.) The inference, of course, is that the Board members' lack of knowledge of the bonuses when they passed the resolution defeats a claim of ratification. As for Pentz's three remaining points, they pertain to the knowledge of <u>individual</u> directors. Such facts are immaterial to an inquiry as to the cumulative awareness of the Board as a whole.

As the aforementioned assertions demonstrate, genuine issues of material fact exist as to the Board's knowledge prior to passing the ratification resolution. Consequently, summary judgment on this issue is unwarranted.

3. Delaware Safe Harbor Provision for Interested Corporate Transactions

Even if Pentz established beyond dispute that the Board knowingly ratified the execution of the Retirement Statement, our inquiry would not end there. Pentz would still have to satisfy the requirements of the safe harbor provision of the Delaware law governing transactions between corporations and their directors. At common law, such transactions were void as a matter of law because of the taint of self-dealing. <u>See Marciano v. Nakash</u>, 535 A.2d 400, 403 (Del. 1987). Delaware's safe harbor provision ameliorates this result, protecting contracts between directors and corporations where

full disclosure is made to the board of directors and a majority of the disinterested directors in good faith approve the contract, see 8 Del. C. 8 Del. C. § 144(1), or where the contract or transaction is fair as to the corporation as of the time it is authorized, approved or ratified by the board, see 8 Del. C. § 144(3). The fairness referred to in subsection (3) is a question of fact. See O'Neill v. Davis, No. 87 C 4789, 1990 WL 16977, *3 (N.D. Ill. Feb. 2, 1990).

At this stage of the proceedings, Pentz cannot prevail under subsection (1) because a factual dispute exists as to the timing of disclosure to the Board of Pentz's prepaid bonus. Nor does subsection (3) afford Pentz a victory, for that provision requires a showing of intrinsic fairness which is a quintessential issue of fact. See O'Neill, 1990 WL at *3. The record before us contains no evidence pertaining to the fairness of the transaction. Far from being undisputed evidence, this issue is presently undeveloped. Accordingly, this quintessential issue of fact is not ripe for summary judgment.

4. Pentz's Alternative Request for Relief

In his reply brief, Pentz argues in the alternative that he is entitled to the requested relief under Counts II and III (unpaid wages and breach of SERP) irrespective of the Retirement Statement. He maintains that he deserves partially earned long term bonuses totaling $354,327 by "working toward pre-established goals

- 16 -

which were set by the Board in advance of the 1998 year, and measured and graded by the Board in December 1998." Moreover, Pentz contends that since he received the $511,777 payment in December 1998, it is includable in his SERP calculation.

TruServ disputes both of these assertions. As we have previously discussed, the company maintains that its Board did not measure and grade Pentz's performance at the December 1998 board meeting. Furthermore, we find Pentz's calculations perplexing. After scouring the record, we found only one reference to partially earned short term and long term bonuses totaling $354,327. That reference appears in the Retirement Letter, which provides for a two-thirds payment of 1999 incentives and one-third payment of 2000 incentives. Pentz's affidavit seems to contradict the Retirement Statement by prorating the 1998 (not 1999) incentives by two-thirds and the 1999 (not 2000) incentives by one-third. (Pentz Aff. ¶ 11.) This conflict suggests that, contrary to Pentz's representations, he would indeed have to rely on the Retirement Statement in order to recover the two-thirds payment of <u>1999</u> incentives and one-third payment of <u>2000</u> incentives that he seeks. Because the Retirement Statement's validity remains unresolved at this juncture, we cannot find in Pentz's favor on this issue. Absent this factual development, granting summary judgment in Pentz's favor for $354,327 is not appropriate.

Furthermore, TruServ has generated a genuine issue of material fact as to the inclusion of $511,777 in Pentz's SERP calculation. The company has raised facts suggesting that the December payment to Pentz of $511,777 was unauthorized. This, coupled with the company's subsequent deduction of that amount from Pentz's salary, challenges Pentz's assertion that the sum ought to be included in his SERP calculation. Accordingly, we cannot grant Pentz's motion for summary judgment on these claims.

## CONCLUSION

For the foregoing reasons, we deny Plaintiff Paul E. Pentz's motion for summary judgment.

*Charles P. Kocoras*
Charles P. Kocoras
United States District Judge

Dated: ___April 19, 2001___